**Fletcher CASEY, Jr., et al., on behalf of themselves and all others similarly situated, Plaintiffs–Appellees,**

v.

**Samuel A. LEWIS, Director, Arizona Department of Corrections, et al., Defendants–Appellants.**

No. 91–16513.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 5, 1992.

Decided Sept. 23, 1993.

Edward G. Hochuli, Kathleen L. Wieneke, Daniel P. Struck, and David C. Lewis, Jones, Skelton & Hochuli, Phoenix, AZ, for defendants-appellants.

Stuart H. Adams, Jr., Elizabeth Alexander, Adjoa A. Aiyetoro, and David C. Fathi, ACLU Nat. Prison Project, Washington, DC, Alice L. Bendheim, Phoenix, AZ, for plaintiffs-appellees.

Before: GOODWIN, FARRIS, and PREGERSON, Circuit Judges.

## OPINION

FARRIS, Circuit Judge:

### OVERVIEW

The Arizona Department of Corrections appeals an order granting partial summary judgment in favor of a certified plaintiff class of Arizona state prisoners and enjoining the Department from (a) prohibiting contact vis-

its between inmates and their attorneys, and (b) denying food-service jobs to HIV-positive[1] inmates. The inmates brought this action under 42 U.S.C. § 1983 (1988) and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1988). We vacate the injunction. On the issue of attorney-inmate contact visitation, we reverse the grant of summary judgment for the inmate class and order summary judgment in favor of the Arizona Department of Corrections. With respect to the section 504 claim, we remand with instructions to dismiss for lack of standing.

## JURISDICTION

The district court exercised original jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 2201. The Department of Corrections contends that the plaintiff class lacks standing under Article III of the United States Constitution to assert its claims under the Constitution and under section 504. We address the standing issue for these two claims separately. We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## BACKGROUND

This class action was filed by twenty-two named plaintiffs on January 12, 1990. The certified class is composed of all adult persons who are now, or who will be, in the custody of the Arizona Department of Corrections. A subclass consists of all prisoners who are handicapped individuals within the custody of the ADOC or who will in the future be in ADOC custody. Defendants are agents, officials, or employees of the Arizona Department of Corrections.

The prisoners allege that certain policies and practices of the ADOC violate their fourteenth amendment rights of access to the courts. They also claim that HIV-positive inmates are discriminated against in violation of section 504 of the Rehabilitation Act of 1973. The right of access claim is based on the Department's policy prohibiting attorney-client contact visitation to inmates at certain

correctional facilities. The section 504 claim is based on the ADOC policy denying food-service employment to seropositive inmates.

On August 31, 1991, the district court granted summary judgment in favor of the plaintiff class. On September 6, 1991, the court filed an amended memorandum and order. *Casey v. Lewis*, 773 F.Supp. 1365 (D.Ariz.1991). The order enjoined the Arizona Department of Corrections from prohibiting contact visits between inmates and their attorneys in all facilities of the Arizona State Prison system, except for good cause. It also enjoined the Department from denying food-service employment to HIV-positive inmates, in the absence of a written finding that: (1) the inmate is not "otherwise qualified," and (2) the ADOC cannot reasonably accommodate the inmate's "handicap". On October 1, 1991, we denied the Department's petition for an emergency stay of the district court's order.

## STANDARD OF REVIEW

■ Standing is a question of law reviewed de novo. *United Union of Roofers, Waterproofers, and Allied Trades No. 40 v. Insurance Corp. of Am.*, 919 F.2d 1398, 1399 (9th Cir.1990); *Bruce v. United States*, 759 F.2d 755, 758 (9th Cir.1985).

■ Summary judgment also is reviewed de novo. *Jones v. Union Pac. R.R.*, 968 F.2d 937, 940 (9th Cir.1992); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 629 (9th Cir.1987). The inquiry is whether, viewing the evidence in a light most favorable to the nonmoving party, there remain genuine issues of material fact, and whether the district court correctly applied the relevant substantive law. *FDIC v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir.1992).

## DISCUSSION

### I. ATTORNEY–INMATE VISITATION

A. *The ADOC Policy.*

The Arizona Department of Corrections policy forbidding attorney contact visitation

---

1. HIV (Human Immunodeficiency Virus) is the viral agent that causes Acquired Immune Deficiency Syndrome (AIDS). We use the adjectives "HIV-positive" and "seropositive" interchangably to describe individuals who have been found to be infected with HIV.

applies to: (1) inmates housed at the Alhambra Reception Center and awaiting classification; (2) inmates at Cell Block 6 of ASPC–Florence; (3) inmates housed in the Special Management Unit at the Florence facility; and (4) inmates in lock-down units at other ADOC facilities. The nature and extent of permitted visitation depends upon the location of the prisoner and his classification.

Many inmates at Alhambra are allowed contact visitation; those who are not are recent arrivals from county jail who have not yet been classified. They temporarily are considered Level 5, the highest possible security risk.

Cell Block 6 houses more than 100 inmates, roughly one-half of whom have been sentenced to death. The other inmates at CB6 are classified at Level 3. Inmates seeking contact visitation at CB6 are placed, unshackled, in a caged area measuring approximately seven feet high, four feet wide, and three feet deep. A mail slot permits the passage of documents between attorney and inmate.

The vast majority of the prisoners housed at the Special Management Unit are classified as Level 5 security risks. An SMU inmate sits on one side of a cinder-block and glass partition, while his attorney sits on the opposite side. Each side of the partition is equipped with a telephone through which the inmate and attorney converse. Documents are transferred between inmate and attorney in accordance with strict procedures to ensure the privacy of those documents.

## B. *Standing.*

Article III limits the judicial power of the federal courts to "cases" and "controversies." Federal courts are presumed to lack jurisdiction, "unless the contrary appears affirmatively from the record." *Bender v. Williamsport Area Sch. Dist.,* 475 U.S. 534, 546, 106 S.Ct. 1326, 1334, 89 L.Ed.2d 501 (1986) (internal quotation omitted). "On every writ of error or appeal, the first and fundamental question is that of jurisdiction, first, of this court, and then of the court from which the record comes." *Mansfield C. & L.M. Ry. Co. v. Swan,* 111 U.S. 379, 382, 4 S.Ct. 510, 511, 28 L.Ed. 462 (1884).

"[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant'...." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (quoting *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979)). This is the "actual injury" component of the standing doctrine; it requires an injury to be "real and immediate," not merely "conjectural" or "hypothetical." *See O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1973); *Golden v. Zwickler,* 394 U.S. 103, 109–110, 89 S.Ct. 956, 960–61, 22 L.Ed.2d 113 (1969).

At least one *named* plaintiff must satisfy the actual injury component of standing in order to seek relief on behalf of himself or the class. *O'Shea,* 414 U.S. at 494–95, 94 S.Ct. at 675–76. The inquiry is whether any named plaintiff has demonstrated that he has sustained or is imminently in danger of sustaining a direct injury as the result of the challenged conduct. *Id.*

The prisoners allege, and the district court found, that the ADOC policy denying attorney-inmate contact visitation violates the inmates' fourteenth amendment rights of meaningful access to the courts. The prisoners must demonstrate that a named prisoner either sustained or was in imminent danger of sustaining a direct injury as a result of the policy.

The record convinces us that the prisoners have met this burden.[2] They have estab-

---

2. Kyle Baptisto and Frank Bartholic, prisoners at SMU, and Stephen James, a prisoner at CB6, alleged in the complaint inadequate access to the courts. Eight of the twenty-two named plaintiffs alleged some form of interference with their right of meaningful access. None specifically complained about the non-contact policy. Any right to contact visitation is derived, however, from the right of access to the courts. *Ching v. Lewis,* 895 F.2d 608, 610 (9th Cir.1990). Moreover, the record reveals that Stephen James was denied a contact visit with his attorney during

lished a sufficient "personal stake" in the outcome of this action to "assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *See Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). Their injuries, past and threatened, are sufficiently "real and immediate" to confer standing upon the class.

## C. *Merits.*

■ In granting summary judgment, the district court held unconstitutional the ADOC policy denying attorney-client contact visitation to prisoners housed in Alhambra, CB6, SMU, and other lock-down units.

■ A prison inmate is entitled to meaningful access to the courts under the fourteenth amendment. *Bounds v. Smith,* 430 U.S. 817, 822, 97 S.Ct. 1491, 1495, 52 L.Ed.2d 72 (1977). Historically, this right "require[d] prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Id.* at 828, 97 S.Ct. at 1498. The main concern was " 'protecting the ability of an inmate to prepare a petition or complaint.' " *Id.* at 828 n. 17, 97 S.Ct. at 1498 n. 17 (quoting *Wolff v. McDonnell,* 418 U.S. 539, 576, 94 S.Ct. 2963, 2984, 41 L.Ed.2d 935 (1974)).

In *Ching v. Lewis,* 895 F.2d 608, 610 (9th Cir.1990), we held that the right of access to the courts includes contact attorney visitation. The inclusion of contact visitation within the right to meaningful access, however, is merely the beginning of our present inquiry; whether such visitation has been denied unnecessarily remains to be determined. *Ching* does not supply the answer to this question.

■ Any infringement on prisoners' constitutional rights must be reasonably related to legitimate penological interests. *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987). This relaxed standard "is necessary if 'prison administra-

tors ..., and not the courts, are to make the difficult judgments concerning institutional operations.' " *Id.* (quoting *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 128, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977)).

*Turner* identifies four factors relevant in determining the reasonableness of prison policies: (1) whether there is a valid, rational connection between the prison policy and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right; (3) the impact that accommodation of the constitutional right will have on guards, on other inmates, or on the allocation of prison resources; and (4) whether the regulation or policy is an "exaggerated response" to prison concerns. 482 U.S. at 89–90, 107 S.Ct. at 2262. The burden is on the inmates to show that the challenged regulation is unreasonable under *Turner.* *Covino v. Patrissi,* 967 F.2d 73 (2d Cir.1992); *Abdullah v. Gunter,* 949 F.2d 1032 (8th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1995, 118 L.Ed.2d 591 (1992).

### 1. *Rational Connection.*

The Department of Corrections asserts several justifications for its non-contact policy. It argues that the policy serves "the important public interest in protecting inmates, prison staff and the general public from the possibility of assault, hostage-taking and escape." It also contends that the policy is designed to reduce the introduction of contraband.

■ The district court erroneously found that the record precluded it from determining whether the asserted justifications—prevention of escape, assault, hostage-taking, and the introduction of contraband—were the actual reasons behind the implementation of the policy. *Casey v. Lewis,* 773 F.Supp. 1365, 1368–69 (D.Ariz.1991).

Prison officials need merely " 'put forward' " a legitimate government interest, *Walker v. Sumner,* 917 F.2d 382, 385 (9th Cir.1990) (quoting *Turner,* 482 U.S. at 89,

the litigation of this action: his deposition was taken, over his objection, under non-contact conditions established by the Department pursuant to its policy for Cell Block 6.

107 S.Ct. at 2261–62), and provide some evidence that the interest put forward is the actual reason for the regulation. *See Swift v. Lewis,* 901 F.2d 730, 732 (9th Cir.1990). The ADOC provided sufficient evidence under *Walker* and *Smith* that the policy was implemented as a prophylactic security measure. The affidavits of Deputy Warden McFadden and Assistant Director Keeney, as well as the deposition testimony of Warden Crist, support this conclusion.

The district court also found no rational connection between the asserted penological interests and the policy. *Casey,* 773 F.Supp. at 1368–69. This finding was based primarily on the ADOC's failure to cite any incident of assault, hostage-taking, or escape that occurred as a result of contact visitation between attorneys and prisoners.

■■■ The district court placed an unduly onerous burden on the Department of Corrections. A prison official's concern for prison security is entitled to significant deference. *Harper v. Wallingford,* 877 F.2d 728, 733 (9th Cir.1989). In *Harper,* we held that a prison superintendent's affidavit, which stated that certain regulated material, if not censored, "could lead to violence . . .," constituted a sufficient showing of a threat to prison security. *Id.* We required no proof that such materials ever had been the cause of violence. In *Thornburgh v. Abbott,* 490 U.S. 401, 417, 109 S.Ct. 1874, 1883, 104 L.Ed.2d 459 (1989), the Supreme Court found rational certain regulations designed to avoid situations that "although not necessarily 'likely' to lead to violence, [were] determined by the warden to create an intolerable risk of disorder."

We recently decided another case where ADOC officials justified a prison regulation on the basis of *anticipated* security problems. In *Friedman v. State of Arizona,* 912 F.2d 328, 332 (9th Cir.1990), *cert. denied,* 498 U.S. 1100, 111 S.Ct. 996, 112 L.Ed.2d 1079 (1991), we said:

> Here, unlike *Swift,* the ADOC has provided evidence through its expert witness, Kenney, to support its no beard policy.

Although Kenney's testimony largely justifies the regulation on the basis of anticipated security problems, we find Kenney's testimony sufficient. *Swift* might be read as requiring concrete evidence to support the regulation—e.g. in the past, the ADOC had a problem in recapturing a prisoner because he shaved his beard. However, such a reading of *Swift* would create a conflict with *Turner.* *Turner* requires that courts allow prison officials "to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." 482 U.S. at 89, 107 S.Ct. [at] 2262 (emphasis added).

The testimony of Warden Crist demonstrates his belief that contact visits between inmates and their attorneys creates an intolerable risk of a security breach. That belief is not unreasonable.

■■■ The ADOC's failure to specify a past event wherein a contact visit resulted in assault, escape, or hostage-taking, does not render irrational the adoption and implementation of a non-contact policy. *See Thornburgh,* 490 U.S. at 417, 109 S.Ct. at 1883–84; *Friedman,* 912 F.2d at 332–33. Nor does the fact that the policy allows some inmates to have contact visits with family members undermine the rationality of the ban on attorney-inmate contact visits. The inquiry is whether the justifications "invoked" for the policy are served by the policy, *see id.* at 332; *Friend v. Kolodzieczak,* 923 F.2d 126, 127 (9th Cir.1991), not whether a policy banning all contact visits would better serve the asserted security interests. We find a rational relationship between the Department of Corrections' policy and its legitimate penological concerns.

### 2. *Alternative Avenues.*

"Where other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials." *Turner,* 482 U.S. at 90, 107 S.Ct. at 2262 (citation and internal quotation omitted).[3] The "asserted right" here is the right

---

3. "Where, as here, a state penal institution is involved, 'federal courts have a further reason

for deference to the appropriate prison authorities.'" *Dreher v. Sielaff,* 636 F.2d 1141, 1146

of meaningful access to the courts, which includes contact visitation with an attorney. *See Ching,* 895 F.2d at 609–10.

In *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 352, 107 S.Ct. 2400, 2406, 96 L.Ed.2d 282 (1987), the Supreme Court stated: "In *Turner,* we did not look to see whether prisoners had other means of communicating with fellow inmates, but instead examined whether the inmates were deprived of 'all means of expression.'" (Citation omitted). In *Friedman,* 912 F.2d at 332, we applied the *O'Lone* reasoning to a prison policy prohibiting inmates from growing beards. The inmates in *Friedman* had no alternative religious practice to substitute for wearing beards. Nevertheless, we concluded that the inmates were not "denied all means of expression of their religion" because "they could participate in other aspects of their religion," such as eating Kosher food. *Id.* (internal quotation omitted).

Here, the inmates were not denied "all means of expression" of their rights of meaningful access. Those rights are satisfied if prisoners are provided with "adequate law libraries or adequate assistance from persons trained in the law." *Bounds,* 430 U.S. at 828, 97 S.Ct. at 1498. Meaningful access was not completely denied by the prison policy. As the Court said in *Bounds,* "a legal access program need not include any particular element ... [but] must be evaluated as a whole to ascertain its compliance with constitutional standards." 482 U.S. at 832, 97 S.Ct. at 1500. Just as Friedman could express his religion without growing a beard, these inmates can "express" their rights to meaningful access without attorney contact visitation.

At most, a triable issue may remain as to whether the inmates' rights of access were satisfied by adequate libraries or other assistance. We need not remand for trial, however, because resolution of this factor in favor of the inmates would not alter our ultimate legal conclusion—that the *Turner* test of reasonableness is satisfied.

(7th Cir.1980) (quoting *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974), *overruled on other grounds*

### 3. *Impact on Others.*

The ADOC contends that providing contact visitation in areas affected by its non-contact policy will jeopardize the safety of its staff members and of visitors and will lead to an increase in the amount of contraband in its prisons. The inmates argue that the ADOC has not demonstrated that this is so and that, contrary to the affidavit of Deputy Warden McFadden, there is adequate secure space and personnel for contact visits, at least at SMU.

The district court found that contact visits would not significantly affect other inmates, the prison staff, or prison resources. *Casey,* 773 F.Supp. at 1369. In doing so, the court resolved a disputed issue of fact with regard to the impact of accommodation at SMU. Even worse, the court ruled in favor of the inmates though they produced no evidence concerning the impact of accommodation on the other areas affected by the policy.

The district court justified its finding on this factor as follows: "Defendants' claim that contact visits at SMU would require the expenditure of additional resources is insufficient since the 'cost of protecting a constitutional right cannot justify its total denial.'" *Casey,* 773 F.Supp. at 1369 (quoting *Bounds,* 430 U.S. at 825, 97 S.Ct. at 1496–97). The district court mischaracterized the constitutional right at issue: the constitutional right of meaningful access was not necessarily denied in its entirety, even though the inmates were denied contact visitation.

The inmates failed to demonstrate the existence of a triable issue of fact concerning this factor, except perhaps as regards SMU. We need not remand for trial on the question of the impact of accommodation at SMU, however, because the resolution of this factual dispute in favor of the prisoners would not weigh heavily in our analysis. *Cf. Scott v. Mississippi Dept. of Corrections,* 961 F.2d 77, 81 (5th Cir.1992) ("Neither *Turner* nor *O'Lone,* however, *require* a court to weigh evenly, or even consider, each of these factors.").

*by Thornburgh,* 490 U.S. at 413–14, 109 S.Ct. at 1881–82).

### 4. *Exaggerated Response.*

Under *Turner,* the existence of obvious, easy alternatives to a prison policy restricting constitutional rights may be evidence that the policy is not reasonable, but is an "exaggerated response" to prison concerns. 482 U.S. at 90–91, 107 S.Ct. at 2262; *Thornburgh,* 490 U.S. at 418, 109 S.Ct. at 1884. "[W]hen prison officials are able to demonstrate that they have rejected a less restrictive alternative because of reasonably founded fears that it will lead to greater harm, they succeed in demonstrating that the alternative they in fact selected was not an 'exaggerated response' under *Turner.*" *Thornburgh,* 490 U.S. at 419, 109 S.Ct. at 1884–85 (emphasis added).

The inmates suggest that an acceptable alternative to the non-contact policy is for prison guards to: (1) search the prisoner before and after each contact visit, and (2) observe each visit. While this proposal may suffice to stem the flow of contraband, it fails adequately to address the potential problems of hostage-taking and injury to staff and visiting attorneys. *Cf. Friend,* 923 F.2d at 126 (inmates' proposed alternative inadequate where it satisfied some, but not all, of the prison officials' security concerns).

 It is incumbent upon the prisoners to point to an alternative that accommodates their rights at *de minimis* cost to security interests. *Turner,* 482 U.S. at 91, 107 S.Ct. at 2262–63. They have not done so. The non-contact policy is not an exaggerated response.

### 5. *Conclusion: Reasonableness.*

We find that the non-contact regulation is rationally related to legitimate penological interests; that a triable issue may remain as to whether alternative avenues exist for exercising the right to meaningful access and as to the institutional impact of accommodating that right at SMU; and that the regulation is not an exaggerated response to prison concerns.

That said, we must answer the ultimate question: is the regulation reasonably related to the Arizona Department of Corrections' legitimate penological concerns? *Turner,*

482 U.S. at 89, 107 S.Ct. at 2261–62. We hold that it is.

 Contact visitation with an attorney is merely one aspect of the broad and fundamental right of meaningful access to the courts. The prisoners have not been denied access to the courts as that right traditionally has been described by the Supreme Court. *See Bounds,* 430 U.S. at 828, 97 S.Ct. at 1498. Inmates are not denied assistance "in the preparation and filing of meaningful legal papers" as that phrase is interpreted in *Bounds. See id.* (holding that such assistance requires only the provision of adequate law libraries *or* adequate assistance from "persons trained in the law").

The ADOC policy is a reasonable response to the legitimate institutional concerns posed by full contact visitation: prevention of escape, assault, hostage-taking, and the introduction of contraband. This is not to say that expansion of this policy to all facilities within the Arizona State Prison system would be reasonable. The facilities affected by the current policy house primarily prisoners who have been classified as high security risks or who are awaiting classification and therefore prudently assumed high risk. *Cf. Michenfelder v. Sumner,* 860 F.2d 328, 333 (9th Cir.1988) ("The fact that Unit 7 houses the state's most difficult prisoners gives rise to a legitimate governmental security interest in procedures that might be unreasonable elsewhere.").

Nothing in *Ching* is to the contrary. We failed to discuss *Turner* in our decision in *Ching.* We did, however, emphasize that the defendants in *Ching* failed to offer any justification whatsoever for their denial of contact visitation, and we referred to their policy as "arbitrary." 895 F.2d at 610. Had we applied the *Turner* test, we no doubt would have found that the first factor of the analysis, the "rational connection," was missing. Our holding in *Ching* demonstrates merely that where an arbitrary and irrational prison regulation impinges upon the constitutional rights of prison inmates, it is invalid as a matter of law. In other words, *Ching* teaches that satisfaction of the rational relationship factor is necessary, though not necessarily sufficient, to sustain a prison policy

abridging constitutional rights. *Cf. Walker*, 917 F.2d at 385 (rational relationship is the "*sine qua non*" of the *Turner* test); *Scott*, 961 F.2d at 81 (second, third, and fourth *Turner* factors merely help court resolve the controlling question, which is whether the regulation has a logical connection to legitimate governmental interests).

## II. FOOD–SERVICE POLICY

### A. *Standing.*

■ The Arizona Department of Corrections has adopted a policy prohibiting HIV-positive individuals from obtaining employment in its food-service department. The inmates argue they have standing to challenge the validity of this policy because a named inmate is now HIV-positive and because this inmate would have been denied had she applied for such employment.

We reject this argument. The HIV-positive inmate did not demonstrate any injury in fact; she was not identified as HIV-positive until three months *after* the issuance of the district court's injunctive order, and she neither applied for a food-service position nor demonstrated that she intended to do so.

■ We must address standing even though the issue was not presented to the district court. *Mansfield*, 111 U.S. at 382, 4 S.Ct. at 511–12. We first determine our own jurisdiction and then whether the district court had jurisdiction when it entered the injunctive order. *See id.* The fact that an inmate is now HIV-positive is not dispositive. "An asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court." *Allen v. Wright*, 468 U.S. 737, 754, 104 S.Ct. 3315, 3326, 82 L.Ed.2d 556 (1984). The complaining party must demonstrate an injury in fact. *Valley Forge*, 454 U.S. at 473, 102 S.Ct. at 759; *Nevada v. Burford*, 918 F.2d 854, 856 (9th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2052, 114 L.Ed.2d 458 (1991). At the time the district court entered its order, the record did not establish that any named plaintiff was seropositive. The class therefore lacked standing, *see O'Shea*, 414 U.S. at 494–95, 94

S.Ct. at 675–76, and the district court lacked the power to enter the injunction.

Even if a named inmate had been identified HIV-positive as early as the pleading stage, the inmates still failed to demonstrate an actual injury. The inmates rely on a footnote in *Nyquist v. Mauclet*, 432 U.S. 1, 6 n. 7, 97 S.Ct. 2120, 2124 n. 7, 53 L.Ed.2d 63 (1977), to argue that even though no named seropositive plaintiff ever applied for or otherwise expressed an interest in a food-service job, they nonetheless have standing to challenge the validity of the ADOC policy. *Nyquist* does not control. The plaintiff in *Nyquist* submitted an unrebutted affidavit showing that he might need the benefits denied him under the defendant's policy, and the *Nyquist* defendants conceded that any application by the plaintiff for those benefits would be denied summarily. *Id.* Moreover, the plaintiff had already applied for and been denied similar benefits by the defendants under the same policy. *Id.*

No named plaintiff has ever stated that he or she is interested in a food-service job. None applied for one. There is reason to believe that an HIV-positive inmate would never seek such a position. The unrebutted affidavit of Frank Terry, Chief of Security at the Central Unit in the Florence facility, indicates that whenever inmates discover another inmate is HIV-positive, which according to Terry occurs despite stringent confidentiality efforts by ADOC staff members, threats are made against that inmate's life. According to Terry, an HIV-positive inmate whose seropositive status is discovered by the general inmate population would be in a life threatening situation.

No named plaintiff has been subject personally to the alleged unlawful policy. The district court lacked jurisdiction to enter the injunction prohibiting the application of the policy.

## CONCLUSION

The district court erred in entering partial summary judgment for the prisoners and in enjoining the Arizona Department of Corrections from enforcing its non-contact visitation policy and its food-service policy. We VA-

CATE. the injunction. With respect to the visitation policy, we REVERSE the grant of summary judgment for the inmate class and ORDER summary judgment in favor of the Defendants–Appellants. With respect to the food-service policy, we REMAND to the district court with instructions to DISMISS for lack of standing. Each side is to bear its own costs.

PREGERSON, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's disposition of the Rehabilitation Act claim because the class representatives have not demonstrated that any class member has standing to challenge the food service policy. *See Lynch v. Dawson,* 820 F.2d 1014, 1016 (9th Cir.1987). However, I dissent from the majority's opinion with respect to the "access to the courts" claim because the majority has, in effect, abandoned the *Turner* "reasonableness" standard of review in favor of the "toothless" rational basis standard of review. In reversing summary judgment for prisoners on this claim, the majority (1) departs from the well-settled principle that the state bears the burden of justifying a regulation that injures a constitutionally protected interest; (2) disregards our circuit's interpretation of *Turner,* which requires prison officials to *prove* that their asserted justification is the "actual basis" for a challenged regulation; (3) violates Fed.R.Civ.P. 56 by crediting unsupported allegations; and (4) sharply narrows the due process right of access to the courts, as that right has been defined through fifty years of Supreme Court decisions. The majority then compounds these errors by sua sponte entering judgment in favor of prison officials, despite the existence of a genuine issue of material fact, and without remanding the case to permit prisoners to comply with their newly created evidentiary burden.

Because the majority has abdicated its duty to review prisoners' constitutional claims under *Turner*'s reasonableness standard, and in effect has drawn an "iron curtain" between prisoners and the Constitution, *see Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974), I dissent.

## I

## BACKGROUND

### A. *Procedural Background*

On January 12, 1990, twenty-two prisoners initiated this class action against Arizona state prison officials, alleging a number of constitutional and statutory claims. In one claim under 42 U.S.C. § 1983, prisoners alleged that the prison's absolute ban on contact visits between certain prisoners and their attorneys, based solely on the prisoners' assignment to a particular housing unit, violated their due process right of access to the courts.

On May 9, 1991, the district court granted plaintiffs' motion for a preliminary injunction, and ordered prison officials to suspend application of the attorney noncontact visitation policy to Cellblock 6 prisoners. The prisoners then moved for summary adjudication of this claim.

The district court found that the prisoners had established an injury to their right of access to the courts, relying in part on *Ching v. Lewis,* 895 F.2d 608 (9th Cir.1990) (denial of contact visit with attorney violates right of access to the courts). The court further found that prison officials had failed to submit *any* evidence to meet their burden of proving that their asserted security interest was the actual basis for the noncontact policy or that the noncontact policy was reasonably related to their asserted penological interest. *Casey v. Lewis,* 773 F.Supp. 1365, 1368–69 (D.Ariz.1991). The court then enjoined the Arizona Department of Corrections from prohibiting attorney contact visits in all facilities of the Arizona's state prison system, except for good cause.

### B. *The Challenged Policy*

The challenged policy denies contact visits to all prisoners housed in the Special Management Unit, Cellblock 6, the Alhambra Reception Center, or any lockdown unit. ADOC Div. Mgmt. Proc. No. 89–21–B, § 5.1.6 (restricting all prisoners housed in

one of these units to noncontact visits only).[1] A "noncontact" visit is defined as a "visit between an inmate and his visitor that is conducted without any physical contact and with a physical barrier between them." Ariz.Admin.Code § R5–1–101(10).

As a result of this regulation, *all* prisoners housed in one of the affected units are *permanently* barred from meeting with their attorneys except under "noncontact" conditions. This prohibition applies without regard to whether any individual prisoner, or his attorney, poses a security risk. The noncontact visit policy also applies to all prisoners assigned to these units, irrespective of the reason any individual prisoner is assigned to one of the affected units. And although prison officials imply that these units are filled only with the prison's most violent and uncontrollable prisoners, these four units also house the prison's *lowest security risk* prisoners, including those segregated for their own protection, and first-time, non-violent offenders awaiting transfer to a "shock incarceration" program. *See* ADOC Internal Management Policy 302.11 § 5.4 (an inmate confined to a cell for purposes of protective segregation is in "lockdown status"); Lewis Depo. (2/28/91) at 65:8–10 (some of the prisoners assigned to the Special Management Unit are assigned to the shock incarceration program and are awaiting the formation of a new platoon); Ariz.Rev.Stat. § 41–1604.08(A)(2) (1992) (only prisoners serving first term of incarceration and not determined to be dangerous and repetitive offenders are eligible for shock incarceration program).

In contrast with this policy of automatic and permanent denial of attorney contact visits for prisoners assigned to one of the four affected units, prisoners housed in all other units are permitted contact visits with their attorneys, as well as with social visitors. A prisoner housed in any other unit except those listed in the noncontact regulation will be denied contact visits with his attorney only if the particular prisoner has violated a prison rule regarding visitation, *i.e.*, possession of contraband or illegal drug use. A prisoner who violates visitation rules or is found with contraband *may* be barred from contact visits, at the discretion of prison officials. ADOC Division Management Procedure 89–21–B §§ 5.1.1, 5.1.5. Prisoners who test positive for illegal drug use are automatically denied noncontact visits, but only for 30 days. *Id.* § 5.1.4.

### C. Conditions of Noncontact Visits with Attorneys

The noncontact conditions imposed on attorney-prisoner visits create substantial obstacles for effective attorney-client communication. Most "noncontact" visits take place in rooms divided by a cinderblock and glass partition. The prisoner and his attorney are seated on opposite sides of the partition. The prisoner can communicate verbally with his attorney only through a telephone attached to the wall farthest away from the glass partition, or by shouting through the glass.

According to uncontroverted evidence in the record, the requirement that prisoners use the telephone to communicate with their attorneys makes any serious exchange a frustrating experience. First, prisoners are required to bend their torsos toward the wall away from their attorneys because the telephone cord is short. Sometimes static and feedback make communication by telephone difficult, and as a result, prisoners are forced to raise their voices. In addition, because prisoners must hold the telephone, it is difficult to review any documents with their attorneys.

The only way an attorney and prisoner can directly exchange documents is through a narrow, wavy slit in the wall opposite the telephone. The size of the opening prevents the exchange of more than one or two pages at a time, and documents sometimes get caught and torn in the transfer process. Although the "wavy" design of the opening is intended to prevent the exchange of contra-

---

**1.** In relevant part, ADOC DMP 89–21–B, provides that:

 5.1.6 The following inmate population shall have non-contact visits:

 5.1.6.1 Special Management Unit
 5.1.6.2 Alhambra Reception Center
 5.1.6.3 Inmates in lock down status or as designated by the Warden.

band, such design makes passing paper cumbersome and slow. Furthermore, when a prisoner transfers or receives a document from his attorney through the slit, he must leave the telephone on the opposite wall. Consequently, the prisoner and attorney can communicate during this exchange process only by shouting through the glass.

To exchange more than one or two pages at a time, an ADOC guard or other employee must transfer the legal documents under a procedure that requires that the guard be out of the view of both the prisoner and the attorney for a period of 2 to 7 minutes. At times, the process is delayed because no guard is available to effect the transfer.[2] The barrier and position of the telephone make it impossible for attorneys and their prisoner clients to simultaneously review documents.

Two attorneys and an ADOC staff member testified that, from positions outside the visitation rooms, they have overheard prisoner-attorney communications taking place inside the noncontact visitation rooms. Some of the conversations were overheard despite the fact that the prisoners and attorneys were using moderate voice tones.

Attorney visits with prisoners housed at Cellblock 6 also may take place with the prisoner locked into a caged area and the attorney seated outside the cage. The cage is constructed of "perforated steel or screen mesh," R.T. 3/22/91 at 56, and measures approximately 34″ deep by 46″ wide by 81″ tall. Def.Resp. in Opp'n to Pls.' Mot. for TRO and Prelim. Inj., Ex. B (schematic of cage).

The only light in the room is on the attorney's side of the cage. The attorney and prisoner can see each others' facial expressions only by looking simultaneously though an open "food trap" located approximately 40″ from the floor. The food trap also permits an exchange of documents, but the steel mesh prevents attorneys and prisoners from simultaneously reviewing the same documents.

## II

### STANDARD OF REVIEW

We review *de novo* a district court's grant of summary judgment. *Jones v. Union Pacific R.R.*, 968 F.2d 937, 940 (9th Cir.1992); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 629 (9th Cir. 1987). Our inquiry is whether, viewing the evidence in a light most favorable to the nonmoving party, there remain genuine issues of material fact, and whether the district court correctly applied the relevant substantive law. *Federal Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir.1992).

To defeat the prisoners' motion for summary judgment, prison officials must establish that a genuine issue of fact exists with respect to any element for which they bear the burden of proof at trial. *See British Motor Car Distributors, Ltd. v. San Francisco Automotive Industries Welfare Fund*, 882 F.2d 371, 374 (9th Cir.1989). Prison officials may not rely on the assertions and allegations of the pleadings; they must set forth specific facts by producing competent evidence that shows a genuine issue for trial. Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Conclusory affidavits that do not affirmatively show personal knowledge of specific facts are insufficient. Fed.R.Civ.P. 56(e); *Conner v. Sakai*, 994 F.2d 1408, 1412 (9th Cir.1993); *Long v. Bureau of Economic Analysis*, 646 F.2d 1310, 1321 (9th Cir.1981).

## III

### RIGHT OF ACCESS TO THE COURTS

Under the Due Process Clause, "[r]egulations and practices that unjustifiably obstruct the availability of professional representation

---

2. When asked in deposition how long the transfer process takes, an ADOC staff member who monitors noncontact attorney visits testified that "[s]ometimes it takes a while to get an officer available because they are busy or whatever.

But if I can get an officer and they follow the procedure of how to get to the room ... I would say about five minutes." Gagnon Dep. at 24:25–25:5.

or other aspects of the right of access to the courts are invalid." *Procunier v. Martinez,* 416 U.S. 396, 419, 94 S.Ct. 1800, 1814, 40 L.Ed.2d 224 (1974), (citing *Ex parte Hull,* 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941)). *Accord Bounds v. Smith,* 430 U.S. 817, 822, 97 S.Ct. 1491, 1495, 52 L.Ed.2d 72 (1977) (due process guarantees prisoners access to the courts that is "adequate, effective, and meaningful"). The majority recognizes that the prisoners have established that the noncontact visitation policy injures their right of access to the courts. Of course, this conclusion is required by our decision in *Ching,* 895 F.2d at 610 (Arizona Department of Corrections policy that arbitrarily denied prisoner contact visits with his attorney violated right of access to the courts).

The majority also recognizes that the district court used the appropriate test for reviewing the noncontact policy. Under *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), this court must refuse to uphold the noncontact regulations as applied to attorney visits unless prison officials demonstrate that they are reasonably related to a legitimate penological interest. *Id.* at 89, 107 S.Ct. at 2261–62.

However, the majority erroneously allocates to the prisoners the burden of *disproving* the prison officials' asserted justifications for the policy. Furthermore, in its rush to defer to prison officials, the majority credits bare allegations as well as evidence that is clearly insufficient to raise a triable issue under Fed.R.Civ.P. 56(e). Finally, in disregard of fifty years of Supreme Court decisions, the majority holds that prison officials may deny a prisoner access to his own attorney as long as the prison maintains a well-stocked library. I address each of these problems in turn, below.

## IV

## BURDEN OF PROOF

As an initial matter, the majority errs in allocating to prisoners the burden of *disproving* prison officials' asserted justification for the blanket ban on noncontact visits. Relying solely on out-of-circuit authority, the majority declares that "[t]he burden is on the

inmates to show that the challenged regulation is unreasonable under *Turner.*" Opinion at 1520. As I explain below, allocation of this burden to prisoners violates our court's express holdings to the contrary, as well as the well-established practice of the Supreme Court.

### A

We have repeatedly held that we will not uphold a prison regulation that injures a prisoner's constitutional right unless prison officials can demonstrate an adequate justification for the offending regulation. *See, e.g., Walker v. Sumner,* 917 F.2d 382, 386 (9th Cir.1990); *Swift v. Lewis,* 901 F.2d 730, 732 (9th Cir.1990). In *Walker,* for example, we explained that:

> Prison authorities cannot rely on general or conclusory assertions to support their policies. Rather, they must first identify the specific penological interests involved and then *demonstrate* both that those specific interests are the actual bases for their policies and that the policies are reasonably related to the furtherance of the identified interests. *An evidentiary showing is required as to each point.*

*Id.* at 386 (emphasis added). *See also Swift,* 901 F.2d at 731–32 (reversing summary judgment where prison officials "failed to provide *any* evidence that the interests they have asserted are the actual bases for their grooming policy" or "evidence that any of these interests justifies" the challenged policy); *Tribble v. Gardner,* 860 F.2d 321, 325 n. 6 (9th Cir.1988) ("when a prison regulation burdens fundamental rights, *the government must show* that the regulation is reasonably related to a legitimate penological goal") (emphasis added), *cert. denied,* 490 U.S. 1075, 109 S.Ct. 2087, 104 L.Ed.2d 650 (1989).

### B

The Supreme Court has not expressly addressed the issue of whether prison officials bear the burden of justifying a challenged regulation. *See Thornburgh v. Abbott,* 490 U.S. 401, 414 n. 12, 109 S.Ct. 1874, 1882 n. 12, 104 L.Ed.2d 459 (1989) (reserving comment on that issue). However, the Court's prac-

tice has been to follow the traditional rule that the government must justify a regulation shown to injure a plaintiff's constitutional interest.[3]

For example, in *Turner*, the Court invalidated a challenged regulation precisely because officials failed to meet their evidentiary burden—even under *Turner's* relatively deferential standard. 482 U.S. at 98, 107 S.Ct. at 2266. The Court refused to sustain the regulation because officials "pointed to nothing in the record suggesting that the marriage regulation was viewed as preventing" prison security problems, and because there was "no place in the record where prison officials testified that ... alternatives would not fully satisfy their security concerns." *Id.*

The Court, in *Abbott*, also approached the issues raised as if prison officials bear the burden of justifying regulations that injure fundamental constitutional interests. In that case the Court held that:

> when *prison officials are able to demonstrate* that they have rejected a less restrictive alternative because of reasonably founded fears that it will lead to greater harm, they *succeed in demonstrating* that the alternative they in fact selected was not an "exaggerated response" under *Turner*.

490 U.S. at 419, 109 S.Ct. at 1884–85 (emphasis added). *See also O'Lone v. Estate of Shabazz,* 482 U.S. 342, 351, 107 S.Ct. 2400, 2405–06, 96 L.Ed.2d 282 (1987) (citing to testimony by prison officials to support findings on each of the *Turner* factors).

Thus, although there is no Supreme Court case directly on point, decisions of the Supreme Court reflect the Court's practice of requiring prison officials to justify regulations shown to violate prisoners' constitutional interests.

C

Completely ignoring the clear precedent of our circuit, the practice of the Supreme Court, and the traditional rules regarding analysis of constitutional claims, the majority relies on two out-of-circuit cases to justify allocating to prisoners the risk of nonpersuasion. *See* Opinion at 1520 (citing *Covino v. Patrissi,* 967 F.2d 73, 79 (2d Cir.1992) (citing *Fromer v. Scully,* 874 F.2d 69, 74 (2d Cir. 1989)); and *Abdullah v. Gunter,* 949 F.2d 1032, 1035 (8th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1995, 118 L.Ed.2d 591 (1992). A careful reading of these out-of-circuit cases, however, reveals that they rely on mischaracterizations of Supreme Court decisions and lack any independent justification for such a drastic departure from precedent.

In *Covino*, for example, the Second Circuit simply relies on its earlier decision in *Fromer. See Covino,* 967 F.2d at 79 (citing *Fromer,* 874 F.2d at 74). *Fromer*, in turn, held that "there was no burden on [prison officials] to persuade the district court that its concerns were justifiable. Rather, the burden was on the plaintiff to show that these concerns were irrational." *Fromer,* 874 F.2d at 74. In support of this point, *Fromer* cites

---

**3.** Generally speaking, a regulation that injures an individual's constitutional right will not be sustained unless the government demonstrates that the regulation is necessary to accomplish a compelling state interest. *See e.g., Simon & Schuster, Inc. v. Members of the New York State Crime Victims Board,* —— U.S. ——, ——, 112 S.Ct. 501, 509, 116 L.Ed.2d 476 (1991) (equal protection); *Attorney General of New York v. Soto–Lopez,* 476 U.S. 898, 904, 106 S.Ct. 2317, 2321–22, 90 L.Ed.2d 899 (1986) (right to interstate travel); *Richardson v. Ramirez,* 418 U.S. 24, 77, 94 S.Ct. 2655, 2682, 41 L.Ed.2d 551 (1974) (Marshall, J., dissenting) (right to vote); *American Party of Texas v. White,* 415 U.S. 767, 780, 94 S.Ct. 1296, 1305–06, 39 L.Ed.2d 744 (1974) (freedom of association). The Supreme Court has held, however, that courts must employ a less exacting standard when reviewing constitutional challenges to

prison practices and regulations. *See Turner,* 482 U.S. at 89, 107 S.Ct. at 2261–62. In *Turner,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89, 107 S.Ct. at 2261–62.

The Court created this less exacting standard as a means of balancing prisoners' rights under the Constitution, with the need to allow prison officials discretion to deal with the complex concerns of prison administration. *Abbott,* 490 U.S. at 409, 109 S.Ct. at 1879 (citing *Turner,* 482 U.S. at 89–90, 107 S.Ct. at 2261–62). While lessening the showing officials must make to justify their regulations, the *Turner* court did not *absolve* officials from making this showing. Nothing in the language of the *Turner* opinion can be read to support such a proposition.

to *O'Lone* 482 U.S. at 350, 107 S.Ct. at 2405. The cited passage of *O'Lone* provides that:

We think the Court of Appeals decision in this case was wrong when it *established a separate burden on prison officials to prove* "that no reasonable method exists by which [prisoners'] religious rights can be accommodated without creating bona fide security problems." 782 F.2d at 420. *See also id.,* at 419 (Prison officials should be required "to produce convincing evidence that they are unable to satisfy their institutional goals in any way that does not infringe inmates' free exercise rights"). Though the availability of accommodations is relevant to the reasonableness inquiry, we have rejected the notion that "prison officials ... have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Turner,* [482 U.S.] at 90–91 [107 S.Ct. at 2262]. By placing the burden on prison officials to disprove the availability of alternatives, the approach articulated by the Court of Appeals fails to reflect the respect and deference that the United States Constitution allows for the judgment of prison administrators.

*O'Lone,* 482 U.S. at 350, 107 S.Ct. at 2405 (emphasis added). In *Fromer,* the Second Circuit read this language to absolve the state of any burden of proof. However, a close reading demonstrates that *O'Lone* merely reiterated *Turner*'s holding that prison officials are not required to pass the separate "least restrictive means" test to justify a regulation. *See Turner,* 482 U.S. at 90–91, 107 S.Ct. at 2262. And, as noted above, the Court in *O'Lone* went on to review the evidence submitted by prison officials in light of the factors enunciated in *Turner. O'Lone,* 482 U.S. at 351–53, 107 S.Ct. at 2405–07.

The Eighth Circuit's decision in *Abdullah,* 949 F.2d 1032, rests on even weaker ground. There, the court stated that "[p]laintiff had the burden of proving at trial that the [prison] policy prohibiting inmates from making religious donations was not reasonably related to legitimate penological interests." *Ab-*

*dullah,* 949 F.2d at 1035. *Abdullah*'s only support for this proposition is a citation to *Turner,* 482 U.S. at 89, 107 S.Ct. at 2261–62. However, nothing at that page can be construed as support for allocating to prisoners the burden of disproving the state's justification for a challenged regulation.[4]

Thus, the cases relied on by the majority are themselves without support, and offer no independent justification for diverging from the traditional rule that, in the face of a constitutional challenge, the burden is on the state to justify its regulations.

V

## THE *TURNER* ANALYSIS

As did the district court, the majority properly considers the four factors relevant to determine whether a challenged prison policy is reasonably related to a legitimate penological interest: (1) whether there is a valid, rational connection between the prison policy and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right; (3) the impact that accommodation of the constitutional right will have on guards, other prisoners, or the allocation of prison resources; and (4) whether the regulation or policy is an "exaggerated response" to prison concerns. *Turner,* 482 U.S. at 89–90, 107 S.Ct. at 2262.

However, in considering these factors, the majority defers to prison officials' bare allegations that the blanket noncontact policy was implemented to address the prison's security needs, and is logically related to those security needs. Such an approach to the review of an order granting summary judgment violates both case law concerning prisoner suits and Fed.R.Civ.P. 56. In addition, the majority badly mischaracterizes the nature of the right of access to the courts, holding essentially that the prison may prevent any attorney-client communication as long as the prison provides prisoners with access to a well-stocked law library. Finally, the majority erroneously finds in favor of

---

4. The approach of our court is consistent with the approach of the Seventh Circuit. In *Caldwell v. Miller,* 790 F.2d 589 (7th Cir.1986), the court

reversed summary judgment for prison officials because the conclusory affidavits were "an insufficient basis for summary judgment." *Id.* at 598.

prison officials on the final two factors, despite defendants' complete failure to adduce any evidence to support those findings.

### A. Rational Connection to an Actual Penological Interest

The first of the *Turner* factors, whether there is a rational connection between the regulation and the actual underlying penological interest, is an indispensable requisite for the defense of the regulation. *Walker,* 917 F.2d at 385. To satisfy their summary judgment burden, prison officials "must provide *evidence* that the interest proffered is the reason why the regulation was adopted or enforced." *Walker,* 917 F.2d at 385. *Accord Swift,* 901 F.2d at 732. Prison officials must then demonstrate that "the logical connection between the noncontact policy and the asserted goal is [not] so remote as to render the policy arbitrary or irrational." *Turner,* 482 U.S. at 89, 107 S.Ct. at 2262. An evidentiary showing is required as to each point. *Walker,* 917 F.2d at 386.

#### 1. The Actual Basis for the Blanket Noncontact Policy

In opposition to plaintiffs' motion for summary judgment, prison officials asserted that "[t]he main justification for a security procedure limiting contact visitation is to prevent inmates from being in a position where they can assault an attorney, staff member, other inmates or prevent them from escaping or attempting to escape or take hostages." Defs.' Resp. to Pls.' Mot. for Summ. J. at 10.

However, defendants' record citation in support of this assertion does not exist. *See id.* (citing Defs.' Statement of Facts, at 1–6, ¶ 23).[5] This is precisely the type of bare allegation in a pleading that this court has repeatedly rejected as insufficient to support a factual finding in favor of prison officials. *See Walker,* 917 F.2d at 387; *Swift,* 901 F.2d at 731–32.

Rather than affirm the district court, which properly rejected the bare allegation, the majority scours the record in an effort to salvage the prison officials' case. The majority cites to three documents that it considers to be "sufficient evidence ... that the [noncontact] policy was implemented as a prophylactic security measure": (1) the affidavit of James McFadden; (2) the transcript of Warden Roger Crist's deposition; and (3) the affidavit of J.C. Keeney.[6] Opinion at 1521. In my view, these documents are insufficient because (1) only one of them addressed the question at issue, and only with respect to the Special Management Unit, and (2) none of the documents indicate that the witnesses are testifying from personal knowledge.

First, only the McFadden affidavit addresses the question at issue, i.e., "the reason why the regulation was adopted or enforced." *Walker,* 917 F.2d at 385 (9th Cir.1990). *See* McFadden Aff. ¶ 8 ("Controlling the introduction of contraband is a crucial element in the maintenance of a secure and orderly operation within SMU.... *In order to prevent the introduction of contraband,* all visi-

---

5. Defendants' Statement of Facts contains no paragraph 23. Paragraph 22 of Defendants' Statement of Facts does address the reason for the noncontact policy, but the citation to the record does not support the asserted fact. Paragraph 22 of Defendants' Statement of Facts provides that:

> The primary rationale for the non-contact visitation policy at lockdown unit is to prevent escapes, assaults on attorneys and staff and hostage taking. It was also based upon good correctional practice. (Exhibit 7, deposition of [ADOC Director] Samuel Lewis, p. 61, line 25 and p. 62 lines 1–3).

At the cited portion of the deposition, Lewis testifies as follows:

> But I think my decision [to bar attorney contact visits] is based upon good correctional practice. There's no constitutional requirement for contact visits. And I don't, simply

don't believe that you need contact visits in order to do your business as an attorney.
Exhibit 7, Lewis Depo, at 61:25–62:3. Nothing else in the excerpt of Lewis's deposition submitted to the district court supports defendants' assertion that security concerns are the "primary rationale" for the blanket ban on contact visits.

6. In opposition to the prisoners' motion for summary judgment, prison officials submitted five affidavits and no other evidentiary materials. Only three of those affidavits are arguably relevant to the access to the courts claim: those of J.C. Keeney, Assistant Director of Adult Institutions for the Arizona Department of Corrections; James McFadden, Deputy Warden for the Special Management Unit at Florence, Arizona; and Daniel Struck, counsel for defendant prison officials. These affidavits are reproduced in their entirety as an appendix to this dissent.

tation at SMU is noncontact.") (emphasis added). However, it is critical to recognize that this testimony is expressly limited to the application of the policy at Special Management Unit and asserts only an interest in preventing the "introduction of contraband." This affidavit does not address the reason why the noncontact policy was adopted at the other three housing units, and it does not raise prevention of assaults, escapes, or hostage-taking as a basis for the policy.

Furthermore, nothing in the affidavit itself indicates that McFadden is testifying from personal knowledge. *See* McFadden Aff. That an affidavit opposing summary judgment be made from personal knowledge is an express requirement of Fed.R.Civ.P. 56(e), and that fact must be evident from the affidavit itself. *See Conner v. Sakai*, 994 F.2d at 1412 (conclusory affidavits that do not affirmatively show personal knowledge of specific facts are insufficient); *Long*, 646 F.2d at 1321 (same).

In contrast with McFadden's affidavit, the two other documents cited by the majority contain nothing more than general statements related to security. For example, the cited passage of Warden Crist's deposition simply says that holding Cellblock 6 prisoners in a steel cage prevents them from assaulting anyone, attempting to escape, or taking a hostage. Crist Depo. at 19:12–18. Crist does not state that the noncontact policy "was adopted or enforced" for the purpose of preventing assaults, escapes, or hostage-taking. Crist's simple statement that the "caged" attorney visit serves to prevent security problems, does not satisfy defendant's burden of demonstrating the "actual basis" of the regulation. *Cf. Tribble*, 860 F.2d at 325–27 (although digital rectal search *may be justified by security concerns*, defendants' motion for summary judgment on the basis of qualified immunity was properly denied where evidence demonstrated that such searches *may have been conducted for punitive purposes* ); *Turner*, 482 U.S. at 98, 107 S.Ct. at 2266 (noting that the record contained no evidence to suggest that a challenged marriage regulation "was viewed [by prison officials] as preventing" the security concern asserted in their brief).

And like the McFadden affidavit, Warden Crist's affidavit does not indicate that he has personal knowledge of the actual basis for the blanket noncontact policy. In fact, the record affirmatively indicates that Crist *could not have had first-hand knowledge of the actual basis* for the policy because the policy was in effect before he became warden. R.T. 3/22/91 at 113:7–11. *Compare* Lewis Dep. at 61:2–8 (Lewis participated in the approval process for the noncontact policy).

Finally, the Keeney affidavit regarding the Alhambra Reception Center contains nothing more than a vague statement to the effect that "[t]o allow an unclassified inmate a contact visit with an attorney or family member would be an unwarranted security risk and not sound correctional practice." Keeney Aff. ¶ 5. This says nothing about the "actual reason" the noncontact policy is applied to Alhambra, but rather expresses the opinion that it would be "sound" to apply the noncontact policy to Alhambra. And it does not explain why the blanket noncontact policy applies to Reception Center inmates who in fact *have been* classified, but are being held in the Reception Center for medical or space-related reasons.

Thus, the evidence independently unearthed by the majority fails to satisfy defendants' burden of proving that their asserted rationale for the blanket ban on contact visits is the *actual* reason for imposing the ban on the four affected housing units.

### 2. *Logical Connection to the Asserted Penological Interest*

Moreover, as the district court correctly observed, prison officials submitted no evidence from which the district court could conclude that the blanket ban was logically related to the asserted interest. *See Casey*, 773 F.Supp. at 1368–69. In their brief filed in opposition to prisoners' summary judgment motion, prison officials only assert that "[t]he current attorney-client visitation policy serves an important interest in protecting inmates, prison staff and the general public from the possibility of assault, hostage taking and escape." Defs.' Resp. to Pls.' Mot. for Summ.J. at 10:5–8. However, defendants

cite no evidence to support this bare allegation.[7]

Again, this is precisely the situation we faced in both *Walker* and *Swift*.[8] Our refusal to sustain summary judgments for prison officials in those cases because officials relied solely on general, conclusory, and unsupported assertions, requires us to affirm the district court's order of summary judgment for prisoners in this case.

Apart from defendants' failure to produce any substantial evidence to support their position, the record contains ample evidence that establishes the arbitrary nature of the challenged policy. First, the challenged regulation, in effect, denies contact visits to the prison's *lowest security risk prisoners*, as well as the prison's highest security risk prisoners, because both groups are represented in the affected housing units. In contrast, this policy does not deny contact visits to medium security prisoners housed in any of the prison's other units. Moreover, prison regulations permit some prisoners in the affected units to have contact visits with family members and inmate legal workers at the same time they are denied contact visits with their lawyers. These facts demonstrate that "the logical connection between the [noncontact visit policy] and the asserted [security] goal is so remote as to render the policy arbitrary [and] irrational." *See Turner*, 482 U.S. at 89, 107 S.Ct. at 2262.

First, as the evidentiary materials and prison regulations demonstrate, the affected housing units house both "difficult" prisoners (those found to have violated disciplinary rules) as well as the *least threatening* prisoners in the entire prison system. The lockdown units, for example, house prisoners so vulnerable to the general prison population that they are placed in lockdown for their own protection. *See* ADOC Internal Management Policy 302.11 § 5.4. Similarly, some prisoners are assigned to Cellblock 6 simply to await transfer to another unit. Pisano Aff. ¶ 4.

Even the Special Management Unit, which houses the "most ... dangerous prisoners in the Arizona system," McFadden Affidavit ¶ 5, also houses the *lowest* security risk prisoners in the Arizona system: those awaiting an opening in the shock incarceration program. Lewis Dep. 65:8–10. These prisoners are among the least likely to cause any of the concerns cited by prison officials because after a four-month "boot camp" program, they will be returned to the community. Ariz. Rev.Stats. § 41–1604.08(C), (E). To qualify for this program, the prisoner must be in his first term of incarceration and cannot have been determined to be a dangerous and repetitive offender. Ariz.Rev.Stats. § 41–1604.08(A)(2).

The Special Management Unit also houses prisoners who are classified as medium security prisoners ("level 3"). Lewis Dep. at 64:17–24. These prisoners are assigned to the Special Management Unit as residential workers. *Id.* at 65:2–4. Because these prisoners are permitted to carry out employment duties in that unit, it follows that prison officials do not consider them to pose a significant security risk.

Finally, the Alhambra Reception Center houses all incoming prisoners, ADOC Director's Management Order 90–14, including short-timers convicted of non-violent crimes, as well as more "dangerous" prisoners. Although prison officials assert that no prisoner may be held in the Reception Center beyond ten days, the regulations actually authorize retention of certain prisoners in the Reception Center indefinitely. ADOC Director's Management Order 90–14 § 4.5 (listing reasons that inmates may be held at the Recep-

---

7. *The only* evidence cited in this portion of prison officials' opposition relates to the composition of the affected housing units. *See* Defs.' Resp. to Pls.' Mot. for Summ.J. at 9:11–10:24.

8. In *Walker*, for example, the prison's appellate brief asserted that a mandatory AIDs test clearly has a logical connection to legitimate governmental interests. Such testing bears a logical connection to the health, safety and welfare of all of the inmates in the custody of the Nevada Department of Prisons and in [sic] the best interests of public health generally. AIDS testing is clearly a legitimate governmental interest and a valid penological objective. 917 F.2d at 387. This court rejected that assertion as "wholly insufficient to sustain either the defendants' burden or the district court's grant of summary judgment" because the record was "devoid of any relevant evidence." *Id.*

tion Center beyond ten days). Among those who can be held beyond ten days after their arrival are prisoners who suffer from serious medical conditions, those awaiting transfer to another facility, and those whom criminal justice agencies seek to interview. *Id.* Nevertheless, simply by virtue of their assignment to the Reception Center, these prisoners are deprived of contact visits with their attorneys.

Throughout this action, prison officials have implied that the blanket noncontact ban is logically related to prison security concerns because the affected units house violent and disruptive prisoners. However, as discussed above, the evidence indicates that housing assignment is a poor surrogate for a determination that a particular prisoner poses a security risk. Prison officials have not explained, much less demonstrated, the logic of the blanket ban, given the arbitrariness of the classifications of the prisoners housed in the affected units.

A second set of facts drawn from the record also demonstrates the arbitrary nature of the blanket ban. Although prison officials imply that prisoners housed in the affected units pose a security risk if permitted contact visits with their attorneys, some of these same prisoners are permitted to have contact visits with both their families and prisoner legal assistants. R.T. 3/22/91 at 107:24–108:6 (some death-sentenced prisoners housed at Cellblock 6 are permitted to have contact visits with their families); ADOC Internal Management Policy 302.11 § 6.1.10 (prisoners on lockdown status are permitted "personal interviews ... with an approved inmate legal assistant" unless prisoner's "behavior is so bizarre or the inmate's hostility is so extreme that personal contact would pose a threat to the safety of officers or inmates involved").

A policy that permits contact visits with family members and other inmates, but prohibits contact visits with attorneys, is clearly an arbitrary policy with respect to any security interests. Common sense tells us that family members are more likely to pass con-

traband to a prisoner or aid in a prison escape than are officers of the court. In addition, it is difficult to understand why a prisoner would be any less likely to assault or take hostage a prisoner paralegal, than a court-appointed or privately-retained attorney. These inconsistencies further reflect the arbitrary nature of the challenged policy.

The Supreme Court in *Turner* invalidated a restriction on prisoner marriages based on similar reasoning. In that case, prison officials asserted that prisoner marriages create " 'love triangles' [that] might lead to violent confrontations between inmates." *Turner,* 482 U.S. at 97, 107 S.Ct. at 2266. The Court refused to uphold the restriction, in part because "[c]ommon sense ... suggests that there is no logical connection between the marriage restriction and the formation of love triangles: surely in prisons housing both male and female prisoners, inmate rivalries are as likely to develop without a formal marriage ceremony as with one." *Id.* at 98, 107 S.Ct. at 2266.

Likewise in this case, common sense suggests that prisoners assigned to one of the "noncontact" housing units for reasons unrelated to their conduct are no more likely to attempt escape, take a hostage, or receive contraband than similarly situated prisoners housed in other units. Common sense also suggests that prisoners are more likely to be aided in an escape by family or another inmate, than by an attorney; that family members are more likely to pass contraband to prisoners than are attorneys; and that prisoners are more likely to assault or take hostage another inmate than their own attorneys. Because the fit between this blanket ban and asserted (but unproven) security interests is so tenuous, and because prison officials have submitted no evidence to explain the policy's obvious inconsistencies and arbitrary results, I would find that the policy lacks a logical connection to the asserted justification for the ban. The majority's conclusion to the contrary is not supported by the record or by logic.[9]

---

**9.** Despite defendants' failure to point to any relevant evidence on this issue, the majority scours the record on their behalf. The majority settles

on citations to five pages in Warden Crist's testimony at an earlier hearing on prisoners' application for a temporary restraining order at Cell-

### 3. The Role of "Deference" in Constitutional Challenges to Prison Regulations

Despite the arbitrary relationship between the blanket ban and the asserted security interest, and despite the complete lack of evidence that the asserted security interest is in fact the actual basis of the blanket ban, the majority resolves this first factor from *Turner* in favor of prison officials. The majority justifies ignoring the clear evidentiary requirements of *Swift* and *Walker* by creating a new rule. According to the majority, federal courts are required to defer to a prison official's belief that a particular situation creates a security risk, if that belief is not unreasonable. *See* Opinion at 1521 (concluding that Warden Crist's testimony demonstrates his "not unreasonable" belief that "contact visits between inmates and their attorneys create an intolerable risk of a security breach").

In support of this unduly deferential approach to prisoners' constitutional claims, the majority relies on cases that caution courts to defer to the expertise of prison officials on issues related to prison security. However, in each of the cases cited by the majority, prison officials produced *significant, detailed,* and *competent* evidence to support their asserted security interests. And nothing in these cases authorizes us to defer to an officials' conclusory expression of security concerns—especially where the record does not support such an expression.

The cases cited by the majority are not to the contrary. In each of those cases, prison officials produced competent evidence in the form of specific facts, that logically demonstrated the connection between the challenged policy and the prison officials' interest. *See, e.g., Abbott,* 490 U.S. at 419, 109 S.Ct. at 1884–85 (remanding to the district court a First Amendment challenge to a prison regulation, with instructions to determine whether the warden's rejection of each of the 46 publications introduced at trial was constitutionally permissible); *Friedman v. State of Arizona,* 912 F.2d 328, 330 (9th Cir.1990) (affirming verdict for defendants after a bench trial, where prison officials testified in detail as to the actual basis of the challenged regulation and explained in detail how the regulation served the prison's security interests); *Harper v. Wallingford,* 877 F.2d 728, 729–30 (9th Cir.1989) (summary judgment granted in favor of prison officials only after officials supplemented the record with detailed affidavits from a psychiatrist and a prison superintendent). This court has already resolved the tension between the requirement that prison officials *prove* their asserted justifications, and the deference due to prison officials' expertise on the subject of prison security. As we explained this resolution in *Walker,*

> deference does not mean abdication. Prison officials must "put forward" a legitimate governmental interest to justify their regulation, and must provide *evidence* that the interest proffered is the reason why the regulation was adopted or enforced. The Constitution requires that "considerations advanced to support a restrictive policy be directly implicated by the protected activity, and sufficiently articulated to permit meaningful constitutional review." It is only after prison officials have put forth such evidence that courts defer to the officials' judgment.

*Walker,* 917 F.2d at 385–86 (citations omitted). *See also Turner,* 482 U.S. at 98, 107 S.Ct. at 2266 (refusing to defer to security concern expressed by prison officials regarding a marriage restriction where the asserted interest was not supported by the record); *cf. Cleavinger v. Saxner,* 474 U.S. 193, 207, 106 S.Ct. 496, 504, 88 L.Ed.2d 507 (1985) (routine and automatic arguments to the effect that "every step taken to protect consti-

---

block 6. The substance of this testimony is accurately summarized as follows: (1) the cages used for attorney visits at Cellblock 6 prevent assaults, escapes, and hostage-taking (R.T. 3/22/91 at 85); (2) Crist believes death-sentenced prisoners are more likely to assault others or attempt to escape because "they have very little to lose" (*id.* at 89); (3) prison officials may more easily resolve hostage situations where the prisoner is unarmed (*id.* at 95); Crist reviewed the noncontact policy with staff and believes it developed to prevent security problems (*id.* at 97); and the noncontact policy prevents contraband, assaults, escapes, and hostage situations (*id.* at 115). None of this testimony addresses any of the arbitrary aspects of the challenged policy.

tutional rights of prisoners will lead to a breakdown in institutional discipline and security" are inadequate to support restrictive prison regulations or policies).[10]

In this case, defendants have failed to point to any evidence that could establish that their asserted security concerns are the actual basis for the blanket ban. They have also failed to demonstrate that the blanket ban, in the context of other prison practices, is logically related to their asserted interest in security. The evidence independently identified by the majority, a collection of stray, security-related comments, does not satisfy this burden either. Therefore, the district court properly found that defendants had failed to meet their burden in opposing summary judgment.

Demonstrating the logical connection between this challenged regulation and the actual purpose of the regulation is a *sine qua non* of the prison's defense. *See Walker,* 917 F.2d at 385. Because defendants failed to sustain their burden as to this factor, the majority should have affirmed the district court without discussing any of the additional *Turner* factors. *See id.* However, even if defendants had established a "valid, rational connection" to a legitimate penological interest, plaintiffs are entitled to summary judgment because defendants fail to adduce any competent evidence on any of the remaining factors.

### B. Alternative Means for Prisoners' Access to the Courts

The second factor to consider to determine whether the relationship between a prison regulation and its underlying interest is "reasonable," is whether prisoners have an alternative means of achieving that right. *Turner,* 482 U.S. at 89, 107 S.Ct. at 2261–62. In opposition to the motion for summary judgment, officials asserted that

Contact visitation is not necessary for inmates to exercise their right to counsel. Other means exist by which their right may be exercised. The alternative means for inmates to exercise their right to communicate with counsel include the mail, non-contact visitation and non-monitored telephone calls.

Defs.' Resp. to Pls.' Mot. for Summ.J. at 11:1–6.

The district court rejected this argument. Judge Muecke found that attorneys need contact visits to assess their clients' demeanor and credibility, and to establish a rapport with their clients. I agree. *Casey,* 773 F.Supp. at 1369. *See also Ching,* 895 F.2d at 609 (rejecting the Arizona Department of Corrections' contention that noncontact visits, and mail and telephone communication satisfied prisoner's right of access to the courts).

In addition to the district court's findings, and this court's rejection in *Ching* of precisely this contention, 895 F.2d at 609, the undisputed evidence in the record demonstrates that noncontact conditions impose a substantial barrier to effective attorney-client communication. For example, as one attorney explained in an affidavit, the steel mesh barrier between the attorney and her client prevents much of the subtle but important non-verbal or confidential interactions that attorneys normally rely on during depositions. The attorney is unable to see her client's expressions through the grate, and therefore does not know whether his silences are the result of some confusion, lack of memory, or simply because he never heard her questions.

The lack of opportunity for prisoners and their attorneys to simultaneously review legal documents creates another substantial impediment to effective legal representation. Appellate review of a criminal conviction, for

---

**10.** I would be especially reluctant to defer in this case to defendants' "expertise" because defendants' practice of prohibiting contact visits to prisoners based solely on their housing assignment violates the Standards for Adult Correctional Institutions issued by an association of corrections experts. Those Standards require that:

> Written policy and procedure provide that inmate visiting facilities permit informal commu-

nication, including opportunity for physical contact. *Devices that preclude physical contact are not used except in instances of substantiated security risk.*

American Correctional Association, in cooperation with the Commission on Accreditation for Corrections, *Foundation/Core Standards for Adult Correctional Institutions* § C2–4206, at 156 (April 1989) (emphasis added).

the most part, is limited to the contents of the record created at trial and sentencing hearings. The procedures for exchanging documents, whether page by page or by the boxload with the help ·of a prison guard, simply is no substitute for simultaneous review of the record by an attorney and her client. An adequate opportunity for reviewing and discussing the record is especially critical in a capital case, where effective lawyering literally can make the difference between life and death.

As· a result of these conditions, even the most rudimentary of communications becomes cumbersome and frustrating. Combined with time limitations imposed on attorney visits, these conditions severely abridge prisoners' access to legal representation. The record here makes clear that noncontact attorney visits, much less communication by telephone and mail, are no substitute· for contact visits with attorneys.

### Libraries and Prisoner Paralegals as Substitutes for Attorneys

In a startling departure from the arguments advanced by the parties, the majority declares that the prisoners here "were not denied 'all means of expression' of their rights of meaningful access" because it is possible that they have access to "adequate libraries or other assistance." Opinion at 1522.[11] This declaration seriously distorts the scope of prisoners' constitutional right of access to the courts and is unsupported by the record.

First, the majority asserts that prisoners' right of meaningful access to the courts is "satisfied if prisoners are provided with 'adequate law libraries or adequate assistance from persons trained in the law.'" Opinion at 1522 (citing *Bounds*, 430 U.S. at 828, 97 S.Ct. at 1498.) *Bounds*, however, addresses only prisons' affirmative duties under the Due Process Clause to *provide* some form of legal assistance to incarcerated persons. *See*

*Bounds*, 430 U.S. at 828, 97 S.Ct. at 1498 ("We hold, therefore, that the fundamental constitutional right of access to the courts requires prison authorities to *assist inmates* in the preparation and filing of·meaningful legal papers *by providing* prisoners with adequate law libraries or adequate assistance from persons trained in the law.") (emphasis added).

Prior to the Supreme Court's decision in *Bounds*, decisions concerning the right of access to the courts only required prison officials to refrain from unjustifiably *imped-* . *ing* prisoner access to the courts. *See, e.g., Wolff v. McDonnell*, 418 U.S. 539, 579–580, 94 S.Ct. 2963, 2986–87 (1974) (prison may not prohibit inmates from helping each other to prepare civil rights complaints, where state fails to provide counsel); *Procunier v. Martinez*, 416 U.S. 396, 417–23, 94 S.Ct. 1800, 1814–15, 40 L.Ed.2d 224 (1974) (prison may not bar law students and paraprofessionals employed by lawyers from visiting prisoner clients); *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969) (prison officials may not prohibit inmates from helping each other prepare habeas petitions, where state fails to provide counsel); *Ex parte Hull*, 312 U.S. 546, 549, 61 S.Ct. 640, 641–42, 85 L.Ed. 1034 (1941) (state may not prevent prisoner from filing habeas petition with the court). After reviewing these cases, the *Bounds* court expressly stated that the newly announced affirmative duty was an "*additional measure* [ ] to assure meaningful access to inmates able to present their own cases." 430 U.S. at 823–24, 97 S.Ct. at 1496. Thus, *Bounds* did not supplant the historical duty of prison officials to refrain from interfering with prisoners' access to the courts, but rather imposed the additional affirmative duty cited by the majority to provide legal assistance in one form or another.

The majority's opinion ignores the historical parameters of the right of access to the

---

11. In its conclusion, the majority converts this speculative musing into an unqualified assertion:

 The prisoners have not been denied access to the courts as that right traditionally has been described by the Supreme Court. *See Bounds*, 430 U.S. at 828, 97 S.Ct. at 1498. Inmates are

not denied assistance "in the preparation and filing of meaningful ·legal papers" as that phrase is interpreted in *Bounds*. *See id.* (holding that such assistance requires only the provision of adequate law libraries *or* adequate assistance from "persons trained in the law"). Opinion at 1523.

courts and instead concludes that, under *Bounds,* a prison may deny a prisoner access to privately-retained, federally-appointed, or state-appointed counsel as long as the prison maintains a well-stocked library. Such a proposition is clearly foreclosed by the Supreme Court's decision in *Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224. In *Martinez,*

> [t]he court invalidated a California regulation barring law students and paraprofessionals employed by lawyers representing prisoners from seeing inmate clients. *We did so even though California has prison law libraries and permits inmate legal assistance.* Even more significantly, the prisoners in question were actually represented by lawyers. Thus, despite the challenged regulation, the inmates were receiving more legal assistance than prisoners aided only by writ writers. Nevertheless, we found that the regulation "impermissibly burdened the right of access."

*Bounds,* 430 U.S. at 824 n. 11, 97 S.Ct. at 1496 n. 11 (citing *Martinez,* 416 U.S. at 421, 94 S.Ct. at 1815 (emphasis added; citations omitted)).

The majority's characterization of the right of access would have far-reaching ramifications that were not briefed in this appeal, and were not expressly considered by the majority. For example, indigent persons convicted of crimes are entitled to appointed counsel on direct appeal under the Sixth Amendment. However, under the majority's interpretation of *Bounds,* prison officials could completely deny communication between a prisoner and his Sixth Amendment counsel as long as the prison makes law books or prisoner paralegals available to the prisoner. Furthermore, the majority's interpretation of the right of access would permit prison officials to override the determination of the state and federal legislatures and courts that certain prisoners are entitled to the assistance of counsel in their habeas petitioner proceedings. And of course, the majority's declaration would permit prison officials to prohibit prisoner contact even with privately-retained counsel, so long as the prison provided one of the alternatives required in *Bounds.*

Almost as disturbing as the majority's constriction of prisoners' rights of access to the courts, is the fact that the majority's factual conclusion in this case is unsupported by any evidentiary material in the record. That is, even if the majority's characterization of the right of access were accurate, the record before us contains no evidence to support a finding that the ADOC's current library or inmate legal assistant program is sufficient to meet its affirmative obligation to provide prisoners with assistance.

Consequently, I disagree with the majority's conclusion that prisoners have alternative means of gaining the "adequate, effective, and meaningful" access to the courts guaranteed by the Due Process Clause. *See Bounds,* 430 U.S. at 822, 97 S.Ct. at 1495.

C. *Impact That Accommodation of the Right Will Have on Guards, Other Prisoners, or Allocation of Prison Resources*

The third *Turner* factor is "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner,* 482 U.S. at 90, 107 S.Ct. at 2262. Prison officials presented the district court with argument and evidence relevant to this factor only with respect to the Special Management Unit. *See* Defs.' Resp. to Pls.' Mot. for Summ.J. at 11:13–25. Thus, prison officials implicitly concede that permitting prisoners in the remaining affected units to have contact visits with their attorneys would have *no* impact on staff, inmates, and the allocation of prison resources.

With respect to the Special Management Unit, defendants' bottom line is that full contact attorney-client visitation will require additional staffing and some modification of the prison's physical plant. Their entire argument on this issue is presented in one paragraph:

> The physical plant at SMU is not designed to accommodate contact visitation. The attorney side of the visitation room, which was suggested by the Plaintiffs as a viable area for a contact visit, is in a non-secure area. To allow the high risk inmates at SMU into this non-secure area would greatly increase the possibility of

violence, escapes and/or hostage situations. Additionally, the staffing that would be required in order to conduct such contact visitation is not available at SMU. (DSOF, p. 4, ¶ 9–10). *Therefore, to implement contact visitation at SMU would result in an increased burden on prison resources.*

Defs.' Resp. to Pls.' Mot. for Summ.J. at 11:13–25 (emphasis added).

Defendants' citations to the record correspond to affidavits that essentially repeat the general assertions contained in defendants' opposition. As the district court noted, such conclusory evidence does not enable the court to determine whether the impact on prison resources would be significant. *Casey*, 773 F.Supp. at 1369. As the district court wisely concluded, courts should be "unwilling to abridge an inmate's constitutional right of access to the courts" unless prison officials can demonstrate that contact visits would have a *significant* impact on prison resources. *Id.* (quoting *Bounds*, 430 U.S. at 825, 97 S.Ct. at 1496) ("the cost of protecting a constitutional right cannot justify its total denial").

The majority comes to a contrary conclusion, primarily because it erroneously allocates to prisoners the burden of disproving the government's justifications:

> The district court found that contact visits would not significantly affect other inmates, the prison staff, or prison resources. In doing so, the court resolved a disputed issue of fact with regard to the impact of accommodation at SMU. *Even worse, the court ruled in favor of the inmates though they produced no evidence concerning the impact of accommodation on the other areas affected by the policy.*

Opinion at 1522 (emphasis added).

The allocation of burden of proof clearly controls the outcome of this factor. Because

prison officials bear the burden of proving that the blanket ban is justified, and because they have failed to adduce any evidence to satisfy that burden with respect to this factor, the district court properly concluded that this factor should be weighed in favor of prisoners.[12]

### D. *Alternative Means of Achieving the Underlying Goals*

The fourth and final factor we must consider is whether there are alternatives to the noncontact policy that fully accommodate the prisoners' rights at *de minimis* cost to the prison's asserted security interests. *Turner*, 482 U.S. at 91, 107 S.Ct. at 2262–63. If so, this may be considered as evidence that the regulation is not reasonable, but rather represents an "exaggerated response" to prison concerns. *Id.* at 90, 107 S.Ct. at 2262.

In their motion for summary judgment, prisoners asserted that the prisons' current security measures are ready alternatives to the noncontact policy. Prisoners point to evidence that (1) officials search the attorney, the prisoner, and the visitation room prior to all visits (including the noncontact visits), and search the prisoner after each visit, as well; (2) prisoners are escorted to and from the visitation rooms with their hands chained to their waists; and (3) officials can observe the contact visits.

In response, prison officials offer nothing to establish that these measures would not fully accommodate their interests. Their response to the summary judgment motion on this issue comprises two sentences, devoid of any citation to evidence or any reference to the alternatives suggested by prisoners:

> The reasonable restrictions on attorney-client visitation at the Alhambra reception

---

**12.** In passing, the majority adopts a rule from the Fifth Circuit to the effect that we need not consider each of the four factors identified as "relevant" by the *Turner* court. Opinion at 1522 (citing *Scott v. Mississippi Dept. of Corrections*, 961 F.2d 77, 81 (5th Cir.1992) ("Neither *Turner* nor *O'Lone*, however, *require* a court to weigh evenly, or even consider, each of these factors.")). However, because *Turner* identifies each of these factors as "relevant," it is incumbent on the court to consider each and every one

of them. Of course the weight we assign to each of the factors will necessarily vary depending on the factual context of each case, and the specific showing made as to each factor.

As a result I take issue with the majority's conclusion that findings in favor of prisoners on the second and third factors would "not alter our ultimate legal conclusion," Opinion at 1522, or "would not weigh heavily in our analysis." Opinion at 1522.

center, SMU, CB–6 and the lockdown units are not an exaggerated response due to the class of inmate housed in these facilities. The restrictions are necessary to prevent future problems which could arise if contact visitation was allowed.

Defs.' Resp. to Pls.' Mot. for Summ.J. at 12:1–7. This bare assertion is clearly insufficient to satisfy defendants' burden of demonstrating that the blanket ban on contact visits for prisoners housed in certain units is not an "exaggerated response" to prison concerns. *See Abbott,* 490 U.S. at 419, 109 S.Ct. at 1885 ("when prison officials are able to demonstrate that they have rejected a less restrictive alternative because of reasonably founded fears that it will lead to greater harm, they succeed in demonstrating that the alternative they in fact selected was not an 'exaggerated response' under *Turner* ").

In addition to these measures, the prison's remaining regulations governing noncontact visitation would fully serve their interests in prison security. For example, prison officials can suspend contact visitation for any prisoner who violates a visitation rule, is found with contraband, or tests positive for drug use. ADOC DMP 89–21–B §§ 5.1.1, 5.1.4, 5.1.5. In addition, prison officials could suspend contact visits with attorneys under the same conditions their regulations now suspend contact visits with prisoner paralegals: where the prisoner's "behavior is so bizarre or the inmate's hostility is so extreme that personal contact would pose a threat to the safety of officers or inmates involved." ADOC Internal Management Policy, 302.11 § 6.1.10 (1992). These individualized policies are sufficient to address the security concerns of the prison, and are consistent with the standards set by the American Correctional Association. *See* American Correctional Association, *supra,* § C2–4206, at 156.

The majority, speculating in favor of prison officials, holds that "[w]hile [plaintiffs'] proposal may suffice to stem the flow of contraband, it fails adequately to address the potential problems of hostage-taking and injury to staff and visiting attorneys." Opinion at 1523. However nothing in the record supports this conclusion, and prison officials,

with presumed expertise in prison administration, have not even asserted this point.

Clearly, this final factor should also have been weighed in favor of prisoners.

## VI

## SUA SPONTE ORDER OF SUMMARY JUDGMENT IN FAVOR OF PRISON OFFICIALS

After concluding that the district court erred in entering summary judgment in favor of prisoners on this claim, the majority reverses the district court and then *sua sponte* orders summary judgment in favor of prison officials. However, even assuming that the majority's allocation of the burden of proof to prisoners is proper, summary judgment for defendants is precluded because prisoners have raised a triable issue as to whether the asserted security interests were the *actual* bases for the blanket noncontact policy.

On more than one occasion, this court has refused to direct or affirm judgment in favor of officials where prisoners adduce substantial evidence that the interest asserted by prison officials to justify a challenged regulation or practice is not the actual basis for the regulation or practice. For example, in *Tribble,* 860 F.2d at 327, we affirmed the denial of qualified immunity where prison officials asserted "security" concerns as basis for digital rectal search, but the prisoner submitted evidence to establish the procedures were conducted for punitive purposes unrelated to security concerns. Similarly, in *Walker,* we reversed summary judgment where prison authorities submitted no evidence to substantiate their assertion that involuntary AIDS tests served "health and safety" interests, and the prisoner pointed to evidence that the testing program was implemented simply to train state health care workers. 917 F.2d at 387.

In their motion for summary judgment, prisoners point to two documents that create a genuine issue of material fact as to the actual basis for the noncontact policy: the deposition of Samuel Lewis, Director of the Arizona Department of Corrections, and a letter from Assistant Director Keeney.

Lewis participated at the final review level and approved the noncontact policies at Cellblock 6 and the Special Management Unit. Lewis Dep. at 61:1–8. When asked at his deposition to state his reasons for approving attorney noncontact visit policy, Lewis said:

> I feel that the United States mail service, the telephone system and non-contact visits provide adequate means for communication between the attorney and his or her client, and that there is no need to have contact visits. Because no one has demonstrated to me the value or need.

When asked whether he reviewed any specific reports of problems arising from attorney-prisoner contact visits, Lewis stated that "there have been reports from time to time, verbal, of problems with attorneys coming into CB–6." Lewis Dep. at 61:20–22. He went on to say:

> But I think my decision is based upon good correctional practice. There's no constitutional requirement for contact visits. And I don't, I simply don't believe that you need contact visits in order to do your business as an attorney.

Lewis Dep. at 61:25–62:4. When asked to elaborate on what specific problems he had heard about in connection with attorney-prisoner contact visits, Lewis said:

> I would have to go back and refresh my memory.... But I guess I simply would repeat that I think just because attorneys or any other citizen wants to do something doesn't mean that I necessarily have to accommodate what their wants are.

Lewis Dep. at 62:5–17. Thus, Lewis is the only witness whose personal knowledge of the actual basis of the noncontact policy is established affirmatively in the record. And Lewis did not mention prevention of escapes and assaults, or contraband control, as the basis for the policy.

In addition to the Lewis deposition, plaintiffs submitted a letter written to a private attorney by J.C. Keeney, Assistant Director of the Arizona Department of Corrections. In relevant part the letter states:

> Regarding your inquiry about contact versus non-contact attorney visits, I offer the following information.

A few months ago, implementation of a Death Row Classification System in CB–6 resulted in additional contact visits for qualifying Death Row inmates. *Limited visitation space, anticipated increase in attorney visits, and our obligation to meet attorney visit requests were factors which predicated the decision to change the status to non-contact for all attorney visits unless extenuating circumstances dictate otherwise....*

Pls.' Statement of Facts, Ex. 5 (emphasis added).

Both Lewis's deposition and Keeney's letter are *direct* evidence that the noncontact policy was motivated by non-penological concerns: i.e., the personal preferences of the director of corrections or space limitations. These documents, considered in conjunction with the arbitrary nature of the blanket contact visit ban based on housing assignment, would support a finding that the actual basis for the challenged policy is simply administrative convenience. Needless to say, administrative convenience is not a "legitimate *penological* interest" and therefore cannot justify an injury to prisoners' constitutional rights of access to the courts.

Even assuming that the majority correctly allocated the burden of disproving defendants' asserted justifications for the noncontact policy, prisoners have identified evidence that creates a genuine issue of material fact that can be resolved only by a finding of fact. And because the disputed issue (that the actual basis for the noncontact policy be a "legitimate penological interest") is a critical element of the majority's defense, *see Walker,* 917 F.2d at 385, prisoners are entitled, at the very least, to a hearing before a factfinder to determine the actual purpose of the noncontact policy.

## VII

### CONCLUSION

For the reasons set forth above, I cannot join the majority's opinion, which in my view sets back our constitutional jurisprudence 50 years.

APPENDIX

*AFFIDAVIT OF J.C. KEENEY*

STATE OF ARIZONA

County of Maricopa

I, J.C. Keeney, do hereby testify as follows:

1. I am the Assistant Director of Adult Institutions for the Arizona Department of Corrections.

2. Many of the inmates at the Alhambra facility are allowed contact visits with attorneys. These include the inmates in B Ward as well as the resident inmate workers.

3. Inmates who are not allowed contact visits with attorneys at Alhambra are inmates who are being processed after arriving from the county jail.

4. The inmates who are in processing are not at Alhambra for more than ten days.

5. These inmates are not allowed contact visits because they have not yet been classified. Until they are classified all inmates are considered level 5, the highest security risk. To allow an unclassified inmate a contact visit with an attorney or family member would be an unwarranted security risk and not sound correctional practice.

6. Inmates that are in designated lockdown units at other facilities within the Department of Corrections system are also not allowed any contact visits. These inmates are placed in lockdown units for disciplinary violations or for investigative lock-up. For the most part, these inmates are in the lockdown units for a limited period of time, usually thirty days or less. All of these inmates are allowed non-contact attorney visits.

7. It is well known that one of the major causes of riots at correctional institutions in the United States is inmate dissatisfaction with food services.

FURTHER affiant sayeth not.

(/signed)

_____

J.C. Keeney

\*　　\*　　\*　　\*　　\*　　\*

*AFFIDAVIT OF JAMES McFADDEN*

STATE OF ARIZONA

County of Maricopa

I, James McFadden, do hereby testify as follows:

1. I am a Deputy Warden for the Special Management Unit at Florence (SMU).

2. As Deputy Warden, I am familiar with the attorney-client visitation policy at SMU as well as the facility's attorney-client visitation area.

3. The special management unit is designed to manage the most violent, disruptive and generally dangerous inmates within the Arizona Department of Corrections.

4. The vast majority of inmates presently housed at SMU are assigned to SMU because of their inability to function pursuant to the rules and regulations of the Department of Corrections.

5. These inmates are classified as I–5, are no longer controllable in the general prison population and are a clear security risk.

6. On more than one occasion, inmates at SMU have smuggled weapons into the facility in their body cavities. For example, inmates have hidden .22 caliber shells in their body cavities only to use the shells later to shoot at staff members and other inmates. Additionally, an officer was recently stabbed by an SMU inmate.

7. The operational scheme of SMU is intentionally restrictive and emphasizes security issues first and foremost, thus preventing a large portion of illicit activity which would normally occur in a more open setting.

8. Controlling the introduction of contraband is a crucial element in the maintenance of a secure and orderly operation within SMU. Contact visitation is the most prominent method used by inmates throughout the correctional systems to promote prison contraband. In order to prevent the introduction of contraband, all visitation at SMU is non-contact.

9. IN 1989, there were 165 inmate assaults on SMU staff by various methods.

10. In 1990, 5,645 disciplinary violations were issued to inmates at SMU for adverse

behavior. A great many of these violations related to violence or threats of violence against staff and/or inmates. The amount of violations is more than double the number of violations that occur at a medium custody unit of similar size.

11. At SMU, it would be physically impossible to have secure contact visitation due to the type of inmate that is housed at SMU, the physical facilities available for visitation and the number of staff available.

12. SMU inmates are not allowed in the attorney side of the visitation area. The attorney side of the non-contact visitation area is not a secure area. It would be against sound correctional policy to allow high custody level inmates into a non-secure area such as the attorney side of the non-contact visitation area.

13. DOC personnel cannot overhear conversations between attorney and inmate.

14. DOC personnel strictly follow policy guidelines when transferring a legal document. Documents are sealed in front of the attorney with a non-tampering protective seal. The document is then transferred to the inmate without breaking the seal.

15. To my knowledge, no one has ever complained or alleged that officers eavesdropped during an attorney non-contact visit.

FURTHER affiant sayeth not.

(/signed)

_____

James McFadden

\* \* \* \* \* \*

*AFFIDAVIT OF DANIEL P. STRUCK*

STATE OF ARIZONA

County of Maricopa

I, Daniel P. Struck, do hereby testify as follows:

1. That I am one of the attorneys representing the Defendants in *Casey v. Lewis,* No. CIV 90–54 PHX CAM.

2. I am familiar with the attorney non-contact visitation room at SMU.

3. On April 22, 1991, I went to SMU to depose inmate Jeffrey Phillips.

4. The deposition took place in the attorney non-contact visitation room at SMU. Inmate Phillips was represented by Alice Bendheim.

5. Ms. Bendheim met with inmate Phillips prior to the deposition in one of the attorney non-contact visitation rooms. During this meeting, I was standing outside of the attorney non-contact visitation room. At not time did I hear any of the conversation with [sic] took place between Ms. Bendheim and Mr. Phillips.

6. During the deposition of Mr. Phillips, all of the individuals participating in that deposition were talking in a normal conversational tone of voice.

7. During the deposition of Mr. Phillips I was able to observe inmate Phillips' demeanor, physical characteristics and credibility without any difficulty.

8. Documents could have been reviewed simultaneously by Mr. Phillips and his counsel if two copies of the document were made.

FURTHER affiant sayeth not.

(/signed)

_____

Daniel P. Struck